Ross and another, Appellants, vs. EBERT and others, Respondents.*

*March 8—April 9, 1957.*

* Motion for rehearing denied, with $25 costs, on June 4, 1957.

For the appellants there was a brief and oral argument by *James W. Dorsey* of Milwaukee.

For the respondents there was a brief by *Padway, Goldberg & Previant,* attorneys, and *Saul Cooper, David Leo Uelman,* and *Hugh Hafer* of counsel, all of Milwaukee, and oral argument by *Mr. Uelman* and *Mr. Hafer.*

BROWN, J.  Appellants' first contention is that the circuit court had jurisdiction to order the Bricklayers Union to admit appellants to membership.  For support of this contention they rely principally on sec. 9, art. I, Wis. Const., reading as follows:

"Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice

freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the law."

This constitutional provision has frequently been construed to declare that the wrongs contemplated by this language are those resulting from an invasion of a party's legal right. Not long ago this court so stated in *Scholberg v. Itnyre* (1953), 264 Wis. 211, 58 N. W. (2d) 698. Unions in the past and at present in this state (unless we now decide differently) are voluntary associations to which members may be admitted by mutual consent but into which applicants either by their own efforts or by the aid of the courts cannot force themselves against the will of those already members.

*"Conditions as to Membership.*—Like other associations, trade unions may prescribe qualifications for membership. They may impose such requirements for admission and such formalities of election as may be deemed fit and proper. Moreover, they may restrict membership to the original promoters, or limit the number to be thereafter admitted. No person has an abstract or absolute right to membership." 31 Am. Jur., Labor, p. 861, sec. 58.

*"Generally.*—Membership in a voluntary association is a privilege which may be accorded or withheld, and not a right which can be gained independently and then enforced. The courts cannot compel the admission of an individual into such an association, and if his application is refused, he is entirely without legal remedy, no matter how arbitrary or unjust may be his exclusion. The acceptance of, or intention by the person in question to accept, membership in an unincorporated association is necessary to make him a member of the organization." 4 Am. Jur., Associations and Clubs, p. 462, sec. 11.

It may be disadvantageous to an individual not to be chosen for membership in a voluntary association but the courts hitherto have been powerless to compel the association to receive him. His exclusion has not been a wrong of which

the courts have cognizance by virtue of sec. 9, art. I, Wis. Const.

Appellants, however, have some reason to say that the Fair Employment Code, secs. 111.31 to 111.36, Stats., first enacted in 1945, has altered matters and that exclusion from a labor union because of the applicant's color deals him an injury which the state recognizes as a legal wrong for which there must be legal redress. The language of the statute from which appellants strive to draw such a conclusion is found in sec. 111.31 (1), thus:

"The practice of denying employment and other opportunities to, and discriminating against, properly qualified persons by reason of their race, creed, color, national origin, or ancestry, is likely to foment domestic strife and unrest, and substantially and adversely affect the general welfare of a state by depriving it of the fullest utilization of its capacities for production. The denial by some employers and labor unions of employment opportunities to such persons solely because of their race, creed, color, national origin, or ancestry, and discrimination against them in employment, tends to deprive the victims of the earnings which are necessary to maintain a just and decent standard of living, *thereby committing grave injury to them.*" (Our emphasis.)

If ch. 111, Stats., stopped there perhaps appellants might have something. But it does not; in sec. 111.31 (3), Stats., it continues:

"In the interpretation and application of this subchapter, and otherwise, it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their race, creed, color, national origin, or ancestry. All the provisions of this subchapter shall be liberally construed for the accomplishment of this purpose."

Racial discrimination in employment, so far, is not declared to be illegal. It is pronounced undesirable and the announced public policy of the state is to encourage and

foster employment without such discrimination to the fullest extent practicable. "Encourage and foster;" no slightest reference to "require" or "compel." In the matter of racial discrimination in public accommodations the discrimination is declared to be illegal and penalties are provided for the innkeeper, barber, or public carrier, for instance, who discriminates. Sec. 340.75, Stats. (now sec. 942.04). Nothing of the sort is found in secs. 111.31 to 111.36. Reading secs. 111.31 to 111.36 in their entirety we are unable to find that the legislature created a new right,—one giving to a colored applicant an enforceable right to union membership over the objection, on racial grounds, of the members already there. But if such right was created we must look to the statute to see if the remedy or penalty for a violation is provided. If it is, that remedy is exclusive. *State ex rel. Russell v. Board of Appeals* (1947), 250 Wis. 394, 397, 27 N. W. (2d) 378; *LeFevre v. Goodland* (1945), 247 Wis. 512, 516, 517, 19 N. W. (2d) 884. Where the law gives a new remedy to meet a new situation, the remedy provided by the law is exclusive. *In re Jeness* (1935), 218 Wis. 447, 450, 261 N. W. 415.

So looking, we discover that one believing that he is the victim of racial discrimination in matters affecting his employment may apply to the industrial commission which may then investigate the complaint and give publicity to its findings. The commission may also make recommendations to the interested parties. Secs. 111.35, 111.36, Stats. The complaint alleges that the commission held hearings in this matter, found that the union, or its responsible officers, the respondents, had discriminated against appellants because of their color, and the commission had given publicity thereto and had recommended to the union that it accept the two appellants as members. Investigation, publicity, and a commission recommendation are what the statute provides in consequence of racial discrimination practiced by an em-

ployer or a union. We grant it is cold comfort to appellants but it is all the legislature saw fit to provide. Evidently it was the opinion of that body that the public policy declared by sec. 111.31 (1) and (3) is better served by peaceful persuasion and moral pressure than by force for the statute did not in this code even give the industrial commission the power to make orders directing compliance with the declared public policy. The commission may only recommend. We must conclude, then, that moral force, aroused by the findings, publicity, and recommendations of the commission, is consistent with the intent of the legislature in this enactment and compulsion of a union (or of an employer if he is the discriminator) under a decree of a court, is not.

We are confirmed in this conclusion when we note that the first enactment of sec. 111.31 to sec. 111.36, Stats., was by the legislature in 1945. The bill, as introduced (Senate Bill No. 131, S.), gave power to the industrial commission to order violators to cease and desist and gave the courts power to review and to enforce such orders. That is what appellants ask the court to do now. Before passage the bill was amended and the powers to order and to enforce were removed. As so amended the bill was enacted into law. By Assembly Bill No. 357, A., in 1951 and Assembly Bill No. 390, A., in 1955 amendments restoring the compulsory features were introduced in the legislature but both failed of passage. In the recent "right of privacy case," *Yoeckel v. Samonig* (1956), 272 Wis. 430, 434, 75 N. W. (2d) 925, we said:

". . . particularly because of the refusal of the legislature at two sessions to recognize even a limited right to protection against invasion of the right of privacy, we are compelled to hold again that the right does not exist in this state."

We are convinced that the legislature purposely denied enforcement provisions in the Fair Employment Code and

for us to restore what the legislature struck out would be legislation, not interpretation or construction of the statute. And here there could be no pretense that the court is reading into the statute something consonant with the intent of the legislature but left out through inadvertence or lack of foresight. The statute's history up to the last legislative session emphasizes that there is more to contend with here than an inadvertent omission. The principle of compelling compliance with the purpose of the legislation has been three times intentionally rejected. A clearer declaration of a noncompulsory public policy is hard to imagine. For the court to read into the statute that which the legislature has thrice refused to include would be not only a reversal of the legislative intent but a gross invasion of the legislative field in order to do so.

So far we have considered the issue from the standpoint of the state constitution and statutes. In addition to alleging that they have been violated, the complaint alleges that this discrimination against appellants by the union is a violation of sec. 1 of the Fourteenth amendment to the constitution of the United States. The pertinent part of that amendment is:

". . . No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

From this language alone it would seem to be clear that only discrimination *by state action* is within its contemplation; and the supreme court of the United States has so interpreted it, saying, in *Shelley v. Kraemer* (1948), 334 U. S. 1, 13, 68 Sup. Ct. 836, 92 L. Ed. 1161, ". . . the action inhibited by the first section of the Fourteenth amendment is only such action as may fairly be said to be that of

the states. That amendment erects no shield against merely private conduct, however discriminatory or wrongful." Appellants' citations referring to the amendment are *Plessy v. Ferguson* (1896), 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 536, and *Brown v. Board of Education* (1954), 347 U. S. 483, 74 Sup. Ct. 686, 98 L. Ed. 873. The former opinion approved segregation and the latter disapproved it, but both cases arose from discrimination directed by the state or its agency. In *Shelley v. Kraemer, supra,* the United States supreme court held that the enforcement by a state court of a covenant between private parties discriminating against Negroes in the occupancy or ownership of land was state action denying equal protection of the laws and, hence, a violation of the Fourteenth amendment. But the court went on to say, 334 U. S. 1, 13, 68 Sup. Ct. 836, 92 L. Ed. 1180, "So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the state and the provisions of the amendment have not been violated." The instant complaint does not allege any state action in aid of the discrimination practiced here. On the contrary, the state deplores it and through the good offices of its industrial commission has sought to end it. The state withholds no benefits from Negroes which it grants to Caucasians or others. They are as free as other citizens are to form labor unions with all the rights and privileges of other labor unions, and as free, so far as the state is concerned, to join any existing unions which will have them. The present discrimination is by private persons acting privately. It cannot fairly be said to be the action of the state and therefore its practice is not prohibited by the Fourteenth amendment.

Instructive, too, are the words of the United States supreme court in *Steele v. Louisville & Nashville R. Co.* (1944), 323 U. S. 192, 65 Sup. Ct. 226, 89 L. Ed. 173. The federal Railway Labor Act constituted the Brotherhood

of Locomotive Firemen & Enginemen, an unincorporated labor organization, the exclusive bargaining representative of the whole craft, whether members of the Brotherhood or not. Many firemen were Negroes. They were not members of the Brotherhood and by its constitution were not eligible to membership. The Brotherhood negotiated agreements with certain railroads which deprived Negroes of employment and filled their places with white men. The court said, at page 204, that "While the statute *does not deny to such a bargaining labor organization the right to determine eligibility to its membership,*" it does require the union in collective bargaining to represent nonunion members of the craft without hostile discrimination. It is noteworthy that the constitution of the Brotherhood barred Negroes from membership, yet the court recognized the legal right of a voluntary association so to discriminate. In like manner we find nothing in Wisconsin law denying to a labor union a legal right to determine the eligibility of ·its membership, nor can we find this court charged with a duty, or a right, to compel such a union to take in applicants who are unacceptable for any reasons, color among them, and thereby turn voluntary associations into involuntary ones.

We do not attempt to say what effect the union's racial discrimination against the two appellants, as found and publicized by the industrial commission, in defiance of the announced public policy of the state, might have in the union's enjoyment of rights to state assistance in maintaining statutory benefits given labor organizations. The only question before us now is what, if any, relief can be given appellants by the state courts in response to their complaint. We must reply that the measures already taken by the industrial commission provide the entire remedy given by law in the premises and their complaint did not state a cause of action which the trial court had jurisdiction to entertain.

*By the Court.*—Judgment affirmed.

FAIRCHILD, J. (*dissenting*). I respectfully disagree with the majority.

The crucial question is whether members of a union are the sole arbiters of those with whom they desire to associate and can exclude applicants against whom the members have no grievance except that the applicants belong to a different race or creed.

The majority of the court consider the union as a voluntary association with no more restriction upon its power to admit or reject applicants than would be imposed on a group of people associated for purely social or fraternal purposes.

I am of the opinion that a difference should be recognized in this respect between unions and other voluntary associations and that the courts should give substance to a principle that members of unions do not have the right to exclude people from the enjoyment of the benefits of membership solely on grounds of race or religion.

We are engaged in a struggle to make equality and freedom realities for all Americans. In addition to political equality, the full availability to everyone of education and full opportunity for employment to the extent of his capacity are generally considered the basic essentials in order to erase from America anything which could be termed "second class" citizenship.

The disadvantage to an otherwise qualified applicant who is excluded from membership in a union is clearly substantial. In the eyes of many people in the community, a stigma attaches to him because he is nonunion. Unions properly strive for and often attain for their members advantages in gaining or retaining employment. Persons indifferent to the principles of organized labor nevertheless often prefer to employ union labor because of the attitude of others toward employers who do not. Of course there are a multitude of reasons why a union might validly exclude an applicant.

There may be applicants whose conduct or views demonstrate that they would not be good members. Some applicants will fail to meet proper objective standards germane to the purposes of the union. In the nature of things, union members and officers should enjoy wide discretion and presumptions that they act in good faith. Such latitude should not only be tolerated but should be protected because it may be generally assumed that the members of a union act in good faith to achieve their legitimate purposes. Exclusion of persons from membership solely because of their race cannot, however, possibly contribute to the advancement of the legitimate causes of the union. Where an applicant meets every reasonable standard and is excluded solely because he is a Negro or belongs to some other racial or religious group, the injustice done him is obvious and it is great.

To be the butt of social discrimination is unpleasant in high degree, but to be denied the economic opportunity to work out one's destiny as best he can, solely because of a racial or religious difference, impairs the very substance of citizenship itself. Perhaps the degree of the impairment is so great and the character of the rights impaired so fundamental that the wrong must be recognized and remedied by the judicial branch even in the absence of action by the legislature.

But there is another reason, in any event, for denying members of a union the right to exclude people of a different race or creed. Plaintiffs have an unquestioned constitutional right to equal protection of the laws of this state. Fourteenth amendment, United States constitution. If it be proved that defendant union is excluding plaintiffs because of their race, then the union is denying them the equal protection of the laws of the state concerning the right of organization and collective bargaining in employment relations. This is a wrong which a court of equity ought to prevent.

Ch. 111, subch. I of our statutes, the "Employment Peace Act," creates duties and obligations as well as an administrative agency for the purpose of protecting the rights of employees in the matter of employment relations. It expressly recognizes the interest of the employee in regular and adequate income and that this right, among others, is largely dependent upon the maintenance of fair, friendly, and mutually satisfactory employment relations and the availability of suitable machinery for the peaceful adjustment of whatever controversies may arise. The act expressly recognizes the importance of voluntary agreement between employer and employees as to terms and conditions of work and recognizes the right of an employee to associate with others in organizing and bargaining collectively through representatives of his own choosing.

The act further makes available to those employees who do desire to organize, a state agency which has the duty of protecting them in their activities both in the matter of organization and collective bargaining. It is implicit that the protection which is thus made available to employees is considered by the legislature to be valuable both to the employees and to the general public. The act provides that certain activities on the part of employers are unfair and gives resort to the employment relations board in order to prevent the continuance of those practices. Granted that restrictions are also imposed upon employees; that some or all of these restrictions might not legally exist except for the act; and that there are vigorous differences of opinion as to whether a law which imposed fewer of such restrictions might be more just, nevertheless, it is clear that the right of individual employees to organize is a substantial and valuable one and that the laws regulating employment relations have given greater substance and value to these rights.

Does any voluntary organization of employees enjoying these rights and the protection of the Employment Peace Act

have the right to exclude from the enjoyment of such protection persons of a different race solely for that reason? My answer is "No."

Under the Fourteenth amendment the state must not deny to any person within its jurisdiction the equal protection of the laws. Obviously the state could not include in its regulatory laws any provision making Negroes ineligible for membership in labor unions.

It has now been made clear by the supreme court of the United States that a state court must not enforce a private contract to exclude persons from the ownership or enjoyment of property because of their race. *Shelley v. Kraemer,* 334 U. S. 1, 68 Sup. Ct. 836, 92 L. Ed. 1161, 3 A. L. R. (2d) 441; *Barrows v. Jackson,* 346 U. S. 249, 73 Sup. Ct. 1031, 97 L. Ed. 1586. It seems clearly to follow that if a union had a constitution which restricted its membership on the grounds of race the courts could not enforce that restriction.

It may also follow that when a state court denies relief to persons excluded from the equal protection of the law by a labor union, such denial is itself a violation of the Fourteenth amendment. In any event, however, the granting of relief to plaintiffs by a court would protect their rights under the Fourteenth amendment and that fact alone is a sufficient basis for such action by the court.

It may be said that the plaintiffs could form a new union and that they would then gain for themselves the same legal rights of the members of defendant union, but the plain facts of economic life demonstrate that the possibility of so small a minority forming an effective organization when the defendant is already established in the field is illusory.

As the case now stands it has not been heard upon the merits. Except for the apparent fact that the industrial commission was satisfied that the rejection of plaintiffs was solely by reason of their race, it has not yet been established with finality that the charges made by the plaintiffs are true.

In my opinion the order sustaining the demurrer should be reversed, and the case sent back for hearing upon the merits. If it be proved, as charged, that the rejection of plaintiffs was solely because of their race, defendants should be ordered to accept plaintiffs into membership. In doing otherwise the court is permitting (if the charges are true) the present members of defendant union to exclude other people, merely because of their race, from the full protection afforded by our employment statutes and the agency which administers them.