WATKINS, Respondent, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, Appellant: HERZBRUN and others, Defendants.

*No. 28 (1974). Argued September 8, 1975.—Decided September 30, 1975.*
(Also reported in 233 N. W. 2d 360.)

---

[12] *Gleitman v. Cosgrove, supra,* footnote 1, at page 31.

For the appellant the cause was argued by *Charles D. Hoornstra*, assistant attorney general, with whom on the briefs were *Robert W. Warren*, attorney general, and *Bronson C. La Follette*, attorney general.

For the respondent there was a brief and oral argument by *Percy L. Julian, Jr.*, of Madison.

WILKIE, C. J.    This is a racial discrimination case. In December, 1973, the circuit court reversed and remanded an order of the Department of Industry, Labor & Human Relations (DILHR), which had dismissed the racial discrimination complaint of Gloria Watkins against her employer and union, on the grounds that the alleged discrimination had ended by the employer giving Watkins the job she had allegedly been refused on racial grounds. The court order directed the department to determine

whether or not there had been racial discrimination, or, if it could not so determine, to state why. We affirm.

The facts, in the main, are undisputed. Gloria Watkins, who is black, was hired on January 1, 1968, as a basic zone caseworker in the medical division of the Milwaukee county department of public welfare. She also became a member of Local 594, Council 48, AFSCME, AFL–CIO.

On April 17, 1969, Suzanne Long, a caseworker supervisor, sent a memo to the medical division caseworkers inquiring about their interest in becoming service zone caseworkers. Watkins responded in writing four days later that she was interested in such a position. A service zone position differs from a basic zone position in that there is a reduced caseload, and more attention is given to individual cases. There is no difference in pay between the two jobs.

The first transfers to service zone positions were made by Long on May 19, 1969. All three persons selected were white, all had less seniority than complainant Watkins, and all had received comparable or inferior written evaluations from their supervisors. Long stated that there were two reasons for not selecting complainant. The first was that Joseph McCarthy, her immediate supervisor, had made an unfavorable oral report about her on May 6, 1969. The second was that, in a May 16, 1969, meeting, complainant requested that she not be considered until the end of June, 1969, when she would be caught up with a work backlog in her present job. Watkins denied that she ever made such a request. There was no finding on this point by DILHR.

A definitive transfer policy was adopted by the welfare department on August 21, 1969. This "rule of three" provided that a panel of three candidates was to be chosen based on seniority alone. The appropriate supervisor would then choose one of the three for the job, with seniority as only one of the determining factors.

On three separate occasions, in October and November of 1969, and in early February of 1970, Long made further transfers to service zones, each based on this policy. Complainant was not included in any of the panels of three considered for transfer, although she was entitled to be included on the basis of seniority. There is dispute about what happened then. Long claims that complainant was not considered because she specifically disavowed any interest in transfer on each occasion. Watkins denies any such disavowal.

In late February and again in April of 1970, Watkins' name was on the panel of three, but in neither case was she selected for transfer. All of those selected for transfer, from May of 1969 through April of 1970, were white.

Watkins filed a grievance under the collective bargaining agreement between Council 48 and Milwaukee county, alleging that she had been discriminatorily denied transfer to a service zone. She did not prevail at the initial steps of the grievance procedure, and the union did not take the grievance to the final step in the procedure.

On May 25, 1971, Watkins filed a racial discrimination complaint with DILHR, alleging that the president of Local 594 (Herzbrun) had discriminated against her on the basis of race in failing to process her grievance through the final step, and that two of her supervisors (Long and Paykel) had similarly discriminated against her in failing to transfer her to a service zone position. On November 1, 1971, complainant was transferred to a service zone.

In its "initial determination" on April 26, 1972, DILHR found probable cause to believe that "Respondents' action on transfers and the questionable processing of the grievance had the effect of discriminating against the Complainant because of her race in violation of Wisconsin Statutes, ss. 111.31–111.37."

A conciliation conference was held on May 10, 1972, and proved unsuccessful. A hearing was held on September 14, 1972. Following that hearing, examiner David Rice entered a proposed order on October 30, 1972, recommending that the complaint against Herzbrun as president of the union be dismissed, and finding racial discrimination by Long and Paykel as representatives of the Milwaukee county welfare department and civil service commission. DILHR entered an order on February 16, 1973, dismissing the complaint as to the union on the ground that complainant had refused a bona fide offer made by the union to process her grievance through the final step. The order also drew no conclusion as to whether the union had ever discriminated against Watkins. The complaint was also dismissed as to the county welfare department and civil service commission, on the ground that complainant's November 1, 1971, transfer to a service zone had eliminated the alleged discrimination. DILHR also drew no conclusion as to whether the employer had discriminated against complainant before her November 1, 1971, transfer to a service zone. DILHR did conclude that failure to transfer complainant to an exclusively mentally retarded zone after this date did not constitute racial discrimination, since this was pursuant to a restriction on intra-service zone transfers which was of general application, and since mentally retarded zones did not exist until after this restriction.

Complainant petitioned the circuit court for Dane county for review of this order and the circuit court reversed the DILHR order and remanded to the department for a determination of whether the union or the employer had discriminated against complainant.

On this appeal by DILHR the sole issue is whether, where the employer and union do or are willing to do that which they have previously not done, the department can dismiss the complaint without finding whether dis-

crimination ever occurred, on the ground either (a) that conciliation has taken place, or (b) that the entire controversy was mooted when complainant took the job.

Our answer is "No."

Our review of the DILHR order is in terms of sec. 227.20 (1) (b), Stats., in that it made an "error of law,"[1] in entering its order failing to make a finding on the precise question of the alleged discrimination on the part of the employer and union, or either of them.

### Conciliation.

DILHR correctly states that the Fair Employment Act places a priority on ending discrimination through conciliation. Sec. 111.36 (3) (a), Stats., provides:

"If the department finds probable cause to believe that any discrimination has been or is being committed, it shall immediately endeavor to eliminate the practice by conference, conciliation or persuasion. In case of failure so to eliminate the discrimination, the department shall issue and serve a written notice of hearing, specifying the nature of the discrimination which appears to have been committed, and requiring the person named, hereinafter called the 'respondent', to answer the complaint at a hearing before the department. The notice shall specify a time of hearing not less than 30 days after service of the complaint, and a place of hear-

---

[1] This section provides: "Scope of review. (1) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, testimony thereon may be taken in the court. The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:

" . . .

"(b) In excess of the statutory authority or jurisdiction of the agency, or affected by other error of law; . . ."

ing within either the county of the respondent's residence or the county in which the discrimination appears to have occurred. The testimony at the hearing shall be recorded or taken down by a reporter appointed by the department."

In *Ross v. Ebert*,[2] decided before findings under the act could be enforced by order, this court stated:

". . . Evidently it was the opinion of [the legislature] that the public policy declared by [the Fair Employment Act] is better served by peaceful persuasion and moral pressure than by force . . . ."

Even after order-making power was granted to enforce the act in 1957,[3] this court, in *Murphy v. Industrial Comm.*[4] recognized that conciliation was a mandatory preliminary procedure:

". . . the provisions of sec. 111.36 (3), Stats., limit the circumstances in which the commission can enter orders in the first instance. It must first *'endeavor to eliminate* the practice by conference, conciliation, or persuasion.' . . . Only when it has determined that such efforts have failed may it compel a hearing. Only if *after a hearing* the commission determines that respondent has engaged in discrimination can it make recommendations and order respondent to comply with the 'recommendations.' In other words, if there is compliance in the first instance, no order can issue."

DILHR argues here that the word "conciliation" should be given an expansive definition. Conciliation, according to DILHR, occurs whenever, absent economic injury, the discriminating employer or union voluntarily brings its conduct into line with the statutory mandate to end discrimination, even if this occurs years after the alleged discrimination began, as in this case. Since the county welfare department did transfer Watkins, and since Local 594 did offer to process the grievance through the final

---

[2] (1957), 275 Wis. 523, 529, 82 N. W. 2d 315.

[3] Ch. 266, Laws of 1957.

[4] (1968), 37 Wis. 2d 704, 711, 155 N. W. 2d 545, 157 N. W. 2d 568.

step, DILHR concludes that conciliation has taken place, and that it is legally precluded from proceeding to a determination of the question of discrimination. This is not true.

Conciliation requires the assent of both disputing parties to the proposition that the dispute has ended. Unilateral offers by the employer and union, when they are threatened with a finding of discrimination, do not in and of themselves constitute conciliation. Nor can it be said that complainant's acceptance of a job, to which she may have been entitled years before, implies an agreement on her part that the dispute between her and her employer and union is entirely over. Watkins was unwilling to agree to a conciliation without some sort of resolution of the question whether discrimination had ever occurred. Both the employer and the union persistently refused to concede that they had ever discriminated, and so Watkins aimed for a finding by DILHR on discrimination even though she now had her desired job. Yet DILHR concluded, pursuant to its definition of conciliation, that Watkins had no legal right to such a finding.

While a statutory interpretation by the agency charged with the enforcement of a statute is entitled to some deference,[5] DILHR's broad definition of conciliation is contrary both to the prior cases which speak of conciliation, and to the overall purposes of the Fair Employment Act. The "persuasion" described in *Ross v. Ebert*[6] referred solely to the means by which the industrial commission was to enforce its recommendations, *after* a finding of discrimination had been made. In that case

[5] *Milwaukee v. Wisconsin Employment Relations Comm.* (1969), 43 Wis. 2d 596, 601, 168 N. W. 2d 809; *Cook v. Industrial Comm.* (1966), 31 Wis. 2d 232, 240, 142 N. W. 2d 827; *compare Milwaukee Transformer Co. v. Industrial Comm.* (1964), 22 Wis. 2d 502, 510, 511, 126 N. W. 2d 6.

[6] *Supra,* footnote 2.

the agency made specific and detailed findings that a union had discriminated against two black workers who sought membership in the union, but it could only enforce its recommendation that they be granted membership by persuasion, and not by order. *Ross* thus cuts more in favor of the position that the agency should find on the question of discrimination, than it does in favor of the position that findings are unnecessary because some illusory "conciliation" has occurred. DILHR contends that in *Murphy v. Industrial Comm.*[7] this court held that whenever compliance occurs by an employer or union, the agency can enter no order. The narrow issue in *Murphy* was whether or not the agency had the power to award back pay in a discrimination case in the absence of specific statutory authority to do so. The court held that, since conciliation was the only legislative policy contained in the statute which related to a time prior to the hearing, the additional remedy of back pay could not be granted for this anterior period of time. But remedies which related to the future, such as reinstatement, could be granted. The concept of conciliation was thus used in *Murphy* solely as a means of rebutting a back-pay claim, and not for the purpose of announcing a broad and general definition of conciliation.

The purpose of the Fair Employment Act is "to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry."[8] One of the means to this end is conciliation. Another equally important means is to expose and to give publicity to discrimination where it is found.[9] Exposure and publicity of course require a prior finding on the question of discrimination. To adopt a view of conciliation which would free the department

---

[7] *Supra,* footnote 4.

[8] Sec. 111.31 (3), Stats.

[9] Sec. 111.36 (1), Stats.

from the necessity of making such a finding when in fact no real conciliation has occurred would reduce the situations in which exposure and publicity would serve as a deterrent to future discrimination. We therefore reject the department's proposed definition of conciliation as contrary to the intent and aim of the Fair Employment Act.

### Mootness.

DILHR also argues that this controversy was entirely mooted when Watkins was transferred to a service zone on November 1, 1971. Presumably the mootness in this case rests upon the claim that a determination on discrimination "cannot have any practical legal effect upon the existing controversy."[10] It is true that Watkins cannot be awarded any monetary damages for back pay (since there was no difference in pay between the two positions). Nor can an affirmative order requiring immediate transfer be entered (since she has already been transferred). But, as the hearing examiner originally recommended, the department can, if discrimination is found, enter an order which would have the practical, legal effect of requiring that Watkins be considered for all future transfers on the basis of her qualifications and ability, and without regard to race. The department can also, if discrimination is found, enter an order requiring that Watkins be treated fairly and equally in the processing of future grievances.[11] Moreover, it is harsh to suggest that a finding on discrimination would serve no purpose. For more than two years Watkins was denied

[10] *Wisconsin Employment Relations Board v. Allis-Chalmers Workers' Union* (1948), 252 Wis. 436, 440, 441, 31 N. W. 2d 772, 32 N. W. 2d 190.

[11] An evidentiary hearing will be required before any finding as to union discrimination can be made, since the hearing examiner dismissed the complaint as to the union before any testimony was taken.

the kind of job she desired and for which she deemed herself qualified. She was denied the satisfaction of giving the closer attention to clients which a service zone caseworker customarily gives. She was denied the opportunity of making an intra-service zone transfer before the restriction on such transfers was imposed. She was denied the chance of learning the different skills required of a service zone caseworker. She is entitled to know whether or not this was due to racial discrimination or to some other cause. It would be inequitable to hold that a person who must have suffered deep personal frustration over an extended period of time is not entitled to a determination of the cause of that frustration, while a person who failed to receive a minor pay differential because he or she was not transferred is in all cases entitled to a full legal determination. This disposes of the department's claim that complainant was not "aggrieved . . . and directly affected" by its decision to dismiss within the meaning of sec. 227.16 (1), Stats. It should be reiterated, however, that complainant does not have, on the facts alleged in her complaint, a private cause of action for emotional harm.[12]

There is another reason why mootness is inappropriate in this case. It was first stated by Mr. Justice EDWARD FAIRCHILD in an unfair labor practice case:

". . . To dismiss enforcement proceedings . . . on the grounds that the cessation of the activities which gave rise to the order make it moot would invite circumvention of the established policy of the state. Rather than comply with the entirety of an order of the board, a union or an employer would know that he could wait until enforcement proceedings were begun, then desist from the unfair labor practice in question and move to dismiss the proceedings as moot, thereby evading the authority of the board."[13]

---

[12] *Yanta v. Montgomery Ward & Co., Inc.* (1974), 66 Wis. 2d 53, 62, 63, 224 N. W. 2d 389.

[13] *Wisconsin Employment Relations Board v. Allis-Chalmers Workers' Union, supra,* footnote 10, at page 443.

In the case of discrimination in employment, an employer or union could, if DILHR's view of mootness is accepted, delay compliance until the department was able to hold a hearing (which is sometimes years after the alleged acts of discrimination), then comply and have the complaint dismissed on the ground of mootness. This kind of loophole would have the disastrous effect of encouraging and fostering discrimination, not eliminating it. The department argues that this line of cases is distinguishable in that the right of the state to obtain court enforcement of its orders differs from the right of an individual to require a state agency to make a legal finding in the first place. Yet the inquiry should be, not whose rights are greater, but whether or not the counterproductive effect is the same in both situations. In both cases the evil is the same, since in both cases reliance on mootness would circumvent an established policy of the state.

In the very recent United States Supreme Court case of *DeFunis v. Odegaard,*[14] a white law applicant to the University of Washington Law School sought a mandatory injunction compelling his admission to the law school on the ground that he had been discriminatorily denied admission on the basis of his race in violation of the Equal Protection Clause of the fourteenth amendment. The United States Supreme Court decided that this case was moot, because petitioner had been admitted to the law school by virtue of the lower court's injunction, and had already registered for his final quarter.

The specific reason for holding that the controversy was moot was that there was no relief which the supreme court could give to DeFunis, since he had virtually completed law school, and any injunction regarding admission would be superfluous. Accordingly, *DeFunis* was based upon federal standards for mootness, and specifically upon the federal constitutional restriction limiting

[14] (1974), 416 U. S. 312, 94 Sup. Ct. 1704, 40 L. Ed. 2d 164.

the supreme court to deciding cases and controversies.[15] In *DeFunis* the supreme court specifically recognized that these stricter standards might preclude it from deciding a case which a state supreme court would not regard as moot under its own standards.[16]

Here, however, we apply state standards of mootness. Watkins is still employed by the same employer that had allegedly discriminated against her on the basis of race, and she is also still a member of the same union. It cannot be said that, if discrimination is found, an order of DILHR would be useless. DILHR can order, as the hearing examiner recommended, that Watkins be considered for all future transfers on the basis of her qualifications and ability, and without regard to race. A similar order can be made requiring the union to process Watkins' grievances without regard to her race, if it is found that the union has discriminated. In short, it cannot be said, as it was in *DeFunis*,[17] that any relief granted "cannot affect the rights of litigants in the case before [the court]." Such orders would have a practical, legal effect upon the relation of the parties to this case.

Since neither conciliation nor mootness justify the department's action, its decision is also defective under sec. 227.13, Stats.:

"Every decision of an agency following a hearing shall be in writing accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise and separate statement of the ultimate conclusions upon each material issue of fact without recital of evidence."

The department did not make an ultimate conclusion of fact in regard to whether Watkins had been discriminated against by her employer and union. Nor did it ever find whether or not Watkins had requested not to be put on the selection list for service zone caseworker, as Super-

[15] U. S. Const. art. III, sec. 2.

[16] *DeFunis v. Odegaard, supra,* footnote 14, at page 316.

[17] *Id.*

visor Long testified. The department found only that Long's credibility was "affected" by the fact that Watkins had made no written statement other than her original statement expressing a desire to be considered for service zone caseworker. This is inadequate. The department must find whether or not Watkins actually requested that her name be removed from the list of those to be considered. Such a specific finding is crucial to the ultimate conclusion of discrimination.

The department did find, however, that Watkins could not have been transferred to an exclusively mentally retarded service zone anytime between 1969 and 1971, because such zones did not exist until January, 1972. The department also found that the intra-service zone transfer, imposed on November 1, 1971, was of general application, and did not discriminate against Watkins or her black co-workers. These findings are supported by substantial evidence in view of the entire record as submitted. Thus, on remand, the scope of this case is narrowed to whether or not the employer discriminated against complainant in not transferring her to a general service zone position before November 1, 1971, and whether or not the union discriminated in failing to process her grievance through the final step.

Complainant argues vigorously that racial discrimination is by nature a general practice which affects the employment opportunity of an entire class of people. She further contends that, since this is so, conciliation or mootness of an individual controversy is always insufficient.[18] Therefore, according to complainant, the depart-

---

[18] Complainant relies in part upon *Bowe v. Colgate-Palmolive Co.* (7th Cir. 1969), 416 Fed. 2d 711, to support this line of reasoning. This was a sex discrimination case brought under the federal law. Yet *Bowe* is distinguishable since it involved a job classification and seniority system which applied equally to all women, and prevented them from taking jobs where lifting of more than 35 pounds was required. In this case there is no evidence at all that the employer or union had adopted any kind of general rule applicable to all black workers or members.

ment should investigate, make findings, and enter orders regarding the employment practices of the employer whenever an individual complaint is filed. Whatever may be the merits of this position, it overlooks the fact that certain rudimentary principles of due process and fair play must be complied with in order to reach ongoing acts of discrimination of an employer. As stated in sec. 277.09, Stats., which is entitled "Notification of Issues":

"Every party to a contested case shall be given a clear and concise statement of the issues involved."

Similarly, sec. 111.36 (3) of the Fair Employment Act requires that the department serve a written notice of hearing, "specifying the nature of the discrimination which appears to have been committed." In *Chicago, M., St. P. & P. RR. v. ILHR Dept.,*[19] the department entered a cease-and-desist order applicable to the complainant and to all like-situated employees or applicants for employment, even though the complaint and notice of hearing specified only a single act of discrimination. This court concluded that the findings and order of the department must not be broader than the subject matter specified in the notice of hearing, and modified the order by limiting its application solely to the individual complainant. In the recent case of *Wisconsin Telephone Co. v. ILHR Dept.,*[20] the court decided that due process, as well as sec. 227.09 and sec. 111.36 (3), required that an employer be notified in advance that its entire pregnancy leave benefits policy would be put at issue, and not just its policy as to when it would rehire a woman who had been on pregnancy leave. In this case, Watkins' complaint was strictly limited to allegations of an individual act of discrimination by the employer and union. The initial determination by the department's field represen-

[19] (1974), 62 Wis. 2d 392, 399, 400, 215 N. W. 2d 443.
[20] (1975), 68 Wis. 2d 345, 354–360, 228 N. W. 2d 649.

tative dealt only with discrimination against Watkins. The notice of hearing stated that the complainant charged respondents with "an act of discrimination." The testimony taken at the hearing referred only to that act of discrimination. On this record the department cannot be required to decide whether or not the employer followed a general practice of racial discrimination in its transfer policy.

*By the Court.*—Order affirmed.